**Opinion issued December 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00389-CV

———————————

**BUCKHEAD INVESTMENT PARTNERS, INC., MATTHEW J. MORGAN, AND KEVIN M. KIRTON, Appellants**

**V.**

**BROMPTON COMMUNITY HOUSING DEVELOPMENT CORPORATION, Appellee**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-50902**

---

## MEMORANDUM OPINION

This is a breach of contract case. After partial summary judgments and a bench trial, the trial court rendered judgment that the plaintiffs, appellants

Buckhead Investment Partners, Inc. ("BIP"), Matthew J. Morgan, and Kevin M. Kirton (collectively, "appellants"), take nothing on their claims.

Appellants sold a low-income housing development to appellee, Brompton Community Housing Development Corporation ("Brompton"). Appellants sued Brompton for an accounting and for breach of contract alleging that Brompton had failed to make payments in accordance with the contract and that it owed more than $1 million for a final payment. Brompton filed a counterclaim for a declaratory judgment seeking declarations regarding the construction of the contract at issue in appellants' suit.

The trial court granted three pretrial partial summary judgments construing the contract and leaving some questions of contract construction for trial. The remainder of the dispute, including a calculation of the final payment, if any, that was owed, was submitted to the court at a bench trial. During trial, the court excluded the appellants' expert testimony as a sanction for failing to supplement their expert report. The parties submitted the issue of attorney's fees to the court after trial. The trial court rendered judgment that the appellants take nothing on their claims, granted declaratory judgment further construing the contract, and awarded Brompton attorney's fees.

The appellants raise ten issues on appeal. The first issue challenges the trial court's pretrial summary judgment, which held that appellants waived the right to

receive surplus cash installments. The fifth issue challenges the trial court's failure to file findings of fact and conclusions of law. The second, fourth, sixth, seventh, and eighth issues all, in some way, require us to interpret the contract. The third issue challenges the exclusion of expert testimony. The ninth and tenth issues challenge the award of attorney's fees.

We conclude that the appellants did not waive the right to receive surplus cash installments calculated as required by the contract, and we hold that the trial court's failure to file findings of fact and conclusions of law was harmless. We further conclude that the court reversibly erred by excluding the appellants' expert testimony and in the determination of the contract's maturity date. Accordingly, we will reverse for further proceedings consistent with this opinion.

## Background

### I. The Enclave at Buckhorn Crossing

#### A. Morgan and Kirton decide to develop low-income apartment housing.

Matthew J. Morgan and Kevin M. Kirton went into business together developing real estate, primarily apartment complexes. According to Morgan, BIP was formed in 1996 "to serve as the corporate general partner for various single-purpose partnerships or entities," that would develop new construction multifamily apartment projects. BIP, the general partner of Buckhorn Apartments, Ltd. ("Buckhorn"), a Texas limited partnership, was the developer of The Enclave at

3

Buckhorn Crossing Apartments in San Antonio ("the Enclave"). The construction was financed with a loan from GMAC Commercial Mortgage Corporation, which was insured by the U.S. Department of Housing and Urban Development ("HUD") under a program that insures mortgage loans for low-income apartment housing. The original deed of trust, which the parties refer to as the "Prior Note," was signed on October 17, 2000, for the sum of $13,649,200 with 8% interest.

**B.      HUD-insured loans are subject to additional laws and regulations.**

The loan was "originally endorsed for insurance under Section 221(d)(4) of the National Housing Act." Buckhorn was required to sign a "Regulatory Agreement for Multifamily Housing Projects." In October 2000, Kirton (on behalf of Buckhorn's general partner, BIP) signed the Regulatory Agreement, which provided that it applied to the owner (Buckhorn) as well as its "successors, heirs, and assigns." Among other things, the Regulatory Agreement prohibited any transfer or further encumbrance of the mortgaged property without prior written approval of the Secretary of HUD. The Regulatory Agreement also stated that BIP was not permitted, without prior approval from the Secretary of HUD, to "[m]ake, or receive and retain, any *distribution* of assets or any income of any kind of the project except *surplus cash*," and subject to certain conditions, including that distributions could be made only "as of and after the end of a semiannual or annual fiscal period." (Emphasis added).

The Regulatory Agreement provided the following definitions:

13(f) "Surplus Cash" means any cash remaining after:

    (1)    The payment of:
        (i)    All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary [of HUD];
        (ii)    All amounts required to be deposited in the reserve fund for replacements;
        (iii)    All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary [of HUD]; and
    (2)    The segregation of:
        (i)    An amount equal to the aggregate of all special funds required to be maintained by the project; and
        (ii)    All tenant security deposits held.

    (g)    "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) [regarding surplus cash payments] hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

**C.    The Enclave opens to poor financial performance.**

The Enclave opened in 2002. It operated at a deficit during 2002 and 2003, and Buckhorn made no profit because there was no surplus cash. At that time, the largest annual expenses were the interest on the Prior Note, which was $989,906 in 2003, and property tax, which was $355,920 in 2003. Morgan and Kirton reasoned that for the Enclave to generate surplus cash, both the interest rate on the Prior Note and the property tax needed to be reduced. Texas law provides an exemption

5

from property tax for property owned by a qualifying community housing development organization ("CHDO"), so long as the CHDO received an exemption "for any part of the 2003 tax year."[1] So, in 2003, Morgan and Kirton began looking for a buyer that was a CHDO.

## II.    The Enclave is sold to Brompton.

In December 2003, Morgan and Kirton located a buyer: Brompton, a nonprofit CHDO whose mission is to provide and operate affordable housing. Brompton agreed to assume the Prior Note and to pay a total of $3,335,899.01 in semiannual installment payments with a final payment due at maturity if the indebtedness had not been fully satisfied. However, the agreement was complicated by laws and regulations that applied because the mortgage on the Enclave was insured by HUD. Furthermore, the parties incorporated specific performance targets in the terms of payment to incentivize Brompton to operate the Enclave efficiently and profitably and all parties to work to reduce the debt service payments by modification or refinance of the Prior Note. To effectuate the parties' agreement, multiple contract documents were required. All but one document—the Articles of Conversion—were signed contemporaneously on December 31, 2003.

---

[1]    *See* TEX. TAX CODE § 11.182(j).

**A.** **Articles of Conversion, Assignment of Membership Interest, and Surplus Cash Note**

On December 30, 2003, Buckhorn converted to Brompton Community III, LLC ("BC3"). The next day, on December 31, 2003, BIP, Kirton, Morgan, and their other Buckhorn partners (L.B. Horn, Jr.; L.B. Horn, III; and John M. Rabon) assigned 100% of their membership interest in BC3 to Brompton in exchange for "Ten Dollars and other good and valuable consideration." That same day, these parties also signed a Surplus Cash Note with Brompton, as "Maker."

The Surplus Cash Note required Brompton to make semiannual payments on February 1 and August 1 of each year, which corresponded to the semiannual periods in the HUD Regulatory Agreement. The semiannual installments would consist of $11,087.50 of surplus cash plus 75% of all surplus cash earned thereafter in said semiannual installment period. Brompton also agreed to a one-time payment of $168,208.00. The Surplus Cash Note was secured by Brompton's interest in BC3, and Brompton's obligation to repay the Surplus Cash Note was expressly made subordinate to the obligation Brompton assumed to pay the Prior Note. The Surplus Cash Note was expressly made non-recourse, with the sole method for satisfying the debt after foreclosure to be enforcement of the sellers' security interest in BC3.

In addition, the Surplus Cash Note included the following language:

As long as the Secretary of [HUD] or his successors or assigns is the insurer or holder of the mortgage on [the Enclave], any payments due from project income under this Note shall be payable only from permissible distributions from surplus cash of the said project, as that term is defined in the Regulatory Agreement . . . between the Secretary of [HUD] and [BC3].

**B.     Promissory Obligation, Membership Interest Purchase Agreement, and Pledge & Security Agreement**

Also on December 31, 2003, Brompton and BIP signed a Promissory Obligation that replaced and superseded the Surplus Cash Note, a Pledge and Security Agreement ("PSA"), and a Membership Interest Purchase Agreement ("MIPA"). The parties maintain that these three documents together comprise their "contract."

**1.     Promissory Obligation ("the Note")[2]**

The Promissory Obligation expressly stated that that it replaced and superseded the Surplus Cash Note, which was void and of no effect. The Promissory Obligation was largely the same as the Surplus Cash Note, with the following changes that are relevant to this appeal. First, it added language about the applicability of HUD regulations and rules. The first paragraph of the Promissory Obligation states, in italicized typeface:

---

[2]     The parties sometimes referred to the Promissory Obligation simply as "the Note," and to maintain consistency with record references, we likewise may refer to the Promissory Obligation either as "the Promissory Obligation" or "the Note" in this opinion.

8

*Nothing herein is intended to alter or conflict with the terms, conditions, and provisions of the HUD regulations, handbooks, administrative requirements and Mortgagee notices in effect at the time of the endorsement of the certain Prior Note dated and insured by U.S. Department of Housing & Urban Development (HUD) October 1, 2000, or the documents required to be executed by the mortgagor in connection with the Prior Note; and to the extent they do so, the HUD regulations, administrative requirements, handbooks, Mortgagee notices and documents shall control and this document shall be amended or deemed amended so as to not alter or conflict with the aforesaid regulations, documents, administrative requirements, handbooks or notices. This provision shall terminate and be void upon termination of the HUD insurance of the Prior Note.*

At the bottom of the first page of the Promissory Obligation, the following language appeared in bold, all capitalized typeface:

THIS PROMISSORY OBLIGATION HAS NOT BEEN GIVEN OR UNDERTAKEN BY BUCKHORN APARTMENTS, LTD., N/K/A BROMPTON COMMUNITY III, LLC, A TEXAS LIMITED LIABILITY COMPANY, THE HUD BORROWER AND THE OWNER OF THE ENCLAVE AT BUCKHORN CROSSING, FHA PROJECT NO. 115-35364 ("OWNER").

NOTHING CONTAINED HEREIN NOTWITHSTANDING, IN THE EVENT THERE IS A CONFLICT BETWEEN ANY PROVISION OF THIS NOTE AND A HUD REGULATORY AGREEMENT, HUD REGULATION OR HUD POLICY THE CONFLICT SHALL BE RESOLVED IN FAVOR OF THE HUD REGULATORY AGREEMENT, HUD REGULATION OR HUD POLICY.

The Promissory Obligation referenced HUD regarding a transfer of membership interest in BC3: "Notwithstanding any provision contained in this Note or any other document providing security for this promissory obligation, any transfer of membership interest in Owner [BC3], shall be subject to and in

9

accordance with HUD's transfer of physical assets requirements and policies that are [in] effect at that time."

The Promissory Obligation further provided for a final payment if the principal had not been fully paid by the maturity date. The amount of the final payment would be calculated in accordance with a formula in the Promissory Obligation, which was:

$$\begin{array}{r}
\$221,750 \\
- \text{[the sum of the principal paid before the Maturity Date]} \\
+ \text{[75\% of unpaid Annual Expense overruns]} \\
\underline{+ \text{[75\% of reduction in debt service from modification of Prior Note]}} \\
\text{Final Payment Due on Maturity Date}
\end{array}$$

### 2. MIPA

The MIPA defined the terms of the sale of the membership interest in BC3 and required that funds used to pay principal or interest installments come from "surplus cash and no other source." The MIPA included and the following definition of surplus cash:

any cash remaining after

 (1) the payment of:

  (i) all sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary of HUD,

  (ii) all amounts required to be deposited in the reserve fund for replacements,

10

(iii)　all obligations of the Subject Property other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary of HUD,

(iv)　a one and one-half (1½) percent asset management fee which may be retained by Maker, and

(v)　CHDO expenditures of up to . . . $145,000 . . . per year; and

(2)　the segregation of:

(i)　an amount equal to the aggregate of all special funds required to be maintained by the Subject Property as set forth in the HUD Regulatory Agreement, and

(ii)　all tenant security deposits held.

An amendment to the MIPA required the sellers to "diligently attempt" to refinance the Prior Note to obtain a lower interest rate and Brompton to file for and diligently pursue a property tax exemption.

The MIPA required that any waiver of the agreement must be in writing:

8.3　Entire Agreement and Construction. This Agreement, together with the Exhibits attached hereto, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior arrangements, understandings, negotiations and discussions, whether oral or written, of the parties. No amendment, supplement, modification, **waiver** or termination of this Agreement shall be binding unless executed in writing by the party against whom enforcement is sought. . . .

(Emphasis added.)

**B.  Pledge and Security Agreement ("PSA")**

The Promissory Obligation was secured by the PSA, which granted BIP a security interest in Brompton's membership interest in BC3. It gave BIP the right to replace the property manager based on poor financial performance and specified which property managers would be adequate successors. It defined an event of default, provided remedies for default, and prohibited modifications of the PSA except in a signed writing. Further, it defined "Annual Expense Overruns" and "Controllable Operating Expenses," as follows:

- Annual Expense Overruns are "Controllable Operating Expenses incurred while the Property is managed by Texas Inter-Faith Management in excess of . . . $531,360.00 . . . for the calendar year 2004 (or a pro rata portion thereof), said amount increasing annually by the greater of . . . 2% . . . or the CPI-U for All Items for the San Antonio, TX Metropolitan Statistical Area, as published by the United States Bureau of Labor Statistics (the 'CPI')."

- Controllable Operating Expenses are "all expenses incurred by Borrower [Brompton] in the operation of the Subject Property owned by the Company [BC3] (as defined below) less:

    (1)    All sums due Lender pursuant to the terms of the Prior Note, Prior Deed of Trust or any other instruments securing the payment of said Prior Note, including, without limitation, all payments of principal, interest, fees, charges or reserves which Lender is entitled to collect thereunder, except to the extent such amounts were incurred as a result of Borrower's default thereunder (but not including any default which may have existed prior to the date hereof);

    (2)    All premiums and/or deductibles expended by Borrower [Brompton] or Company [BC3] in connections with policies of casualty, hazard and liability insurance which relate to the Property;

    (3)    Accounting Expenses of not more than $5,000 per year;

12

(4)    CHDO expenditures of $145,000.00 per year;

(5)    An Asset Management fee of not more than 1.5% of the gross rentals received from the Property; and

(6)    Extraordinary costs and expenses incurred in connection associated [sic] with the management and operation of the Property including litigation expenses, expenses incurred in defense of title to any part of the Subject Property, governmentally mandated charges (such additional regulatory requirements, etc.), condemnation or casualty of all or any part of the Property, or any other extraordinary expense which was not reasonably foreseeable by Borrower or not covered by insurance and which, if in excess of $25,000 in any calendar year, was not reasonably approved by Lender.

The PSA also required that any changes be in writing:

7.2    Modifications. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

## III.    After the sale to Brompton

J.O.T. Couch was the executive director of Brompton, BC3, and Texas Inter-Faith Housing Corporation ("TIF Housing"), an entity affiliated with Brompton that served as the asset manager for the Enclave. Some of the information regarding what happened after the sale comes from his declaration; other information comes from trial testimony or documents in the appellate record.

### A.    The Enclave generates no surplus cash for the first three years.

From 2004 through mid-2007, Greystar Management Services, Inc. served as the property manager for the Enclave. Morgan and Kirton failed to negotiate a

lower interest rate on the Prior Note, but the Bexar Appraisal District granted BC3's application for a property tax exemption for 2003. For the first three years after the sale, BC3 generated no surplus cash, and therefore Brompton made no installment payments to BIP from 2004 through 2006.

## B.  Brompton replaces the property manager and refinances the Prior Note to obtain a lower interest rate.

On March 29, 2007, the parties amended the Promissory Obligation's maturity date, extending it to "the last day of the 22nd semi-annual fiscal period following the closing of the refinance of the [P]rior [N]ote." Couch said that this was done "to allow more time for cash flow to pay on the note." About two months later, BC3 refinanced the Prior Note with a HUD-insured loan that reduced the interest rate from 8% per year to 6.09%. BC3 replaced the property manager with Texas Inter-Faith Management Corporation ("TIF Management"), for which Couch was the executive director.

## C.  Bexar Appraisal District revokes the property tax exemption, and Brompton advances money to BC3.

Bexar Appraisal District revoked the Enclave's tax exemption for tax year 2007 and denied the tax exemption for tax years 2008 through 2010. Brompton challenged the denials, and, in early 2012, it won its property tax exemption suit. Bexar Appraisal District eliminated its claims for property taxes for years 2007

14

through 2010, but it later denied the exemption again for years 2011 through 2013. Brompton again challenged the denials in court.

While operating in a surplus cash deficiency, BC3 lacked "the cash to pay the CHDO Fees, which are used to provide social services for tenants." TIF Housing advanced BC3 $145,000 for each of the first three years to pay the CHDO fees. Brompton or TIF Housing also advanced cash to BC3 or paid BC3's property taxes under protest each year from 2004 through 2006 and 2008 through 2014. Couch referred to the advances from both Brompton and TIF Housing as "Owner Advances."

Brompton later repaid these interest-free advances from BC3's surplus cash, reimbursing itself before making installment payments from surplus cash to BIP. Repayment from surplus cash was reported in year-end financial statements and audits, which were sent to BIP. These financial statements and audits routinely noted that Brompton had advanced funds and that the advances were "non-interest bearing and . . . payable from surplus cash."

**C.    BIP questions the calculations and payments, urges Brompton to sell the Enclave.**

In February 2011, Kirton asked Couch about the semi-annual installment payment calculations. In April 2011, BIP sent Brompton a notice of default asserting that Brompton had failed to make a semi-annual installment payment that was due in February 2011. After Brompton prevailed in its tax suit, Kirton began

pressuring Brompton to sell the Enclave. A sale of the Enclave would make the full amount of principal and accrued interest immediately due to BIP, while Brompton's continued ownership of the Enclave meant that BIP was limited to receiving installment payments from surplus cash. Brompton did not want to sell the Enclave because its mission is to provide low-income housing.

**D.    BIP notifies Brompton of default, and Brompton agrees to pay some alleged past due amounts.**

In May 2012, BIP sent Brompton three letters. The first letter was a notice of default asserting that Brompton had failed to make the $168,208 lump sum payment. The second letter was a notice of default asserting that Brompton owed a combined total of approximately $114,087 in semi-annual installment payments from February 1, 2008, through February 1, 2012. The third letter was a notice of intent to change the property manager, alleging a total of $1,205,011 in Annual Expense Overruns from calendar years 2008 through 2011. BIP demanded that Brompton either pay 75% of the Annual Expense Overruns or replace the property manager.

Although Brompton disputed the amounts owed and refused to acknowledge the validity or accuracy of the claims, it agreed to make payments of $168,208 and $114,087, as demanded, so long as both sums would be applied to the principal of the Note. But Brompton denied the allegations about Annual Expense Overruns, challenging BIP's failure to deduct sums that Brompton maintained should have

been deducted under the PSA: litigation costs and extraordinary expenses; CHDO expenditures of $145,000 per year; asset management fees; payments of principal; and lender-required reserve payments. Brompton denied that BIP had the right to require replacement of the property manager.

**E.      Brompton replaces the property manager, refinances a second time, and pays property taxes under protest at closing.**

In January 2013, to reduce its potential liability for Annual Expense Overruns, Brompton replaced property manager TIF Management with Alpha-Barnes Real Estate Management. BC3 refinanced the mortgage on the Enclave a second time, with another HUD-insured loan, which lowered the interest rate to 3.21% per year. In connection with this 2013 refinancing and despite continued property tax exemption litigation, BC3 paid, under protest, the combined 2011 and 2012 property taxes of $1,185,654, and 2013 property taxes of $561,587. BC3 paid $499,235 in property taxes for tax year 2014, but the appraisal district later granted a tax exemption for 2014, and, at that time, BC3 anticipated a refund. The tax payments were made with owner advances from Brompton.

**F.      BIP and Brompton continue to dispute calculations and payments.**

Meanwhile, BIP's partners grew more frustrated by Brompton's failure to make installment payments. In an August 2014 letter to BIP, Couch recounted the financial history of the Enclave since Brompton's purchase. According to Couch,

17

Brompton had advanced over a $1,000,000 to the Enclave for property taxes and CHDO fees. Nevertheless, he maintained that Brompton's work to refinance the mortgage and lower management costs had "decreased annual costs of the property by approximately $532,512 excluding the effects of property taxes which are beyond our control, but which we are fighting as you know."

Couch indicated that, after the 2013 refinance, Brompton projected that the Enclave would have a cash flow between $100,000 to $200,000 per year before payment of CHDO or asset management fees. "That means that the property should operate with stability and allow us to meet our mission without concern of foreclosure for the 1st time in 10 years." He disputed BIP's assertion that Brompton owed an additional $3.5 million, especially in light of their efforts to maximize surplus cash and Morgan and Kirton's failure to modify the Prior Note.

Couch noted that the owner advances, which had ranged from approximately $9,000 to over $1.1 million per year, had grown so large that it would take years to repay. By December 2014, unreimbursed advances from Brompton to BC3 totaled $926,347, and year-end financial reports indicated that these advances were "repayable from surplus cash." Couch also asserted that BIP had been overpaid by $306,000. Finally, Couch opined that it "seem[ed] clear" that the appraisal district "will continue to be malicious in denying our exemption. . . . Predictable surplus cash flow has materially diminished."

From 2014 through 2016, BIP sought financial documents from Brompton and scrutinized surplus cash calculations. In September 2015, Morgan noted in an email to a BIP partner that the latest surplus cash calculation showed "a substantial surplus cash amount all being returned to [Brompton] to satisfy prior advances—and nothing left over to distribute to our group."

## IV.   The lawsuit

### A.   BIP, Morgan, and Kirton file suit.

In August 2016, BIP, Morgan, and Kirton sued Brompton, BC3, and Couch. They alleged that BIP had received no payments of surplus cash between 2004 and 2010, eight payments between February 2010 and August 2012, and no payments from August 2012 to February 2018. BIP alleged that the various financial reports and surplus cash calculations, particularly those received since 2012, had been inaccurate "and/or funds may have been misapplied, misallocated or otherwise accounted for in ways that are inconsistent with the intent of the Note, the associated credit documents," and the HUD Regulatory Agreement. The appellants alleged that the principal and interest due under the surplus cash note was $3,666,187.70 as of June 30, 2016. They pleaded for an accounting, breach of the surplus cash note and the Promissory Obligation, fraud and conspiracy to defraud, and attorney's fees. After the Promissory Obligation matured, the appellants amended their pleading to add a claim for the final payment due under the contract.

19

**B.    Brompton answers and files a counterclaim.**

Brompton, BC3, and Couch answered and filed a counterclaim for a declaratory judgment regarding construction of the parties' contracts. As to the Promissory Obligation, Brompton asked the court to declare that the Prior Note was never modified, the appellants were not entitled to a personal judgment for deficiencies, and the lump sum payment of $168,208 must be credited to the principal balance. As to the Pledge and Security Agreement, Brompton asked the court to declare that it was only liable for Annual Expense Overruns between July 1, 2007, and January 31, 2013, when TIF Management managed the Enclave. Brompton also sought declarations that both CHDO expenses ($145,000 per year) and asset management fees incurred from 2008 through 2013 must be deducted from the calculation of Controllable Operating Expenses. As to the MIPA, Brompton asked the court to declare that the "repayment of owner advances by BC3 to Brompton was an obligation of the Subject Property under the definition of Surplus Cash." Finally, Brompton sought a declaration that the Promissory Note matured on December 31, 2017.

**C.    The parties reach different conclusions about how much money Brompton owed upon maturity.**

In May and June 2019, BIP and Brompton exchanged expert reports regarding the calculation of how much money, if any, Brompton owed BIP at the

maturity date under the contracts. Brompton also deposed Scott Robin, a certified public accountant whom BIP had designated as its testifying expert.

Robin opined that Brompton owed approximately $10,885,000, but Brompton's testifying expert, Todd Burchett, opined that the final payment under the contractual formula resulted in a negative number, -$604,147. Robin and Burchett made different assumptions regarding the construction of the parties' contracts in making their calculations.

**D.     The trial court grants pretrial partial summary judgments and enjoins foreclosure.**

Brompton filed four pretrial motions for partial summary judgment and a motion for reconsideration of the court's ruling on the second motion for partial summary judgment. The trial court made the following pretrial rulings:

- In light of discovery, there was no need for an accounting.

- The June 2012 payment of $168,000 must be credited to the principal for the purpose of calculating the amount due at maturity.

- The term "Controllable Operating Expenses" did not include depreciation expense.

- BIP was not entitled to judgment for alleged underpayments of surplus cash prior to the maturity date.

- CHDO expenditures of $145,000 per year must be deducted from the calculation of Controllable Operating Expenses.

- Asset Management Fees must be deducted from the calculation of Controllable Operating Expenses.

In July 2019, BIP notified Brompton that it intended to sell Brompton's membership interest in BC3 the following month. The trial court later granted Brompton's application for temporary injunction to halt the foreclosure sale, and it set the case for trial.

### E. Trial begins with testimony from Kirton, Morgan, and Couch.

#### 1. Morgan and Kirton testimony

Trial to the bench began on January 12, 2021. At trial, both Kirton and Morgan testified about their understanding of the parties' agreements.

**Maturity Date.** Morgan and Kirton believed that the provision extending the maturity date to "the last day of the 22nd fiscal period following the refinance of the Prior Note," meant that the maturity date would follow 22 full semi-annual fiscal periods, making the maturity date June 30, 2018. Morgan noted that the amendment referenced semi-annual installment periods, not due dates.

**All expenses.** Kirton testified that he believed "all expenses incurred by borrower" as used in the definition of controllable operating expenses necessarily included the six items to be deducted when calculating controllable operating expenses. Morgan testified that he understood "all expenses" to include CHDO expenses and asset management fees, which are not included in "all expenses" for the purpose of a HUD audit.

**Annual expense overruns.** Morgan and Kirton testified that they were responsible for operation of the Enclave until October 2006, when Brompton took over. They believed that Brompton was not liable for annual expense overruns before 2007, but it was liable from 2007 through the maturity date. Both believed that "Texas Inter-Faith," "Texas Inter-Faith Management," or an affiliated entity managed the Enclave in some capacity (property manager or asset manager) from 2007 through 2018.

Morgan testified that he understood the inclusion of 75% of annual expense overruns in the amount due at maturity was to ensure that BIP would be compensated for not receiving surplus cash distributions during the life of the contract because cost overruns reduced the amount of surplus cash available for distribution.

**Debt service reduction and modification of the Prior Note.** Kirton testified that the provision for debt service reduction payments due at maturity applied to both modification and refinancing of the Prior Note. Kirton believed there was no difference between modification and refinancing. Kirton said that it was his intention that "if the interest rate was modified via modification or refinance, we [the plaintiffs] were entitled to 75 percent of that reduction." Morgan acknowledged that the debt service reduction part of the maturity payment applies only when there was a modification of the Prior Note, not if the Prior Note had

23

been extinguished. On cross-examination, Kirton acknowledged that the original lender never agreed to a modification of the Prior Note.

**Sum of principal payments and repayment of principal.** Morgan testified that the sum of Brompton's principal payments was "approximately $1.15 million," which included the $168,000 payment in the contract, which he described as a downpayment, not an installment. Morgan and Kirton understood that it was possible, under the agreements, that Brompton would not fully repay the principal balance of the Promissory Obligation, but both were confident that they would receive full payment, especially considering the provision for a final payment at maturity.

### 2. Couch testimony

**Texas Inter-Faith entities.** Couch testified that the various nonprofit entities with "Texas Inter-Faith" in their names were independent of each other: "There is no parent company of nonprofits. Nonprofits are controlled by their own board of directors. They are all volunteers. It's not any umbrella." According to Couch, fewer than 50% of the members of each board overlapped by serving on the other nonprofits' boards. From 2003 to 2018, Couch served as the executive director of TIF Housing, TIF Management, and Brompton. TIF Management was the asset manager for the Enclave, and it supported refinancing, compliance, and insurance, for example. TIF Housing was the property manager, and it was

involved with maintaining leases and compliance, and Brompton was the manager of the property in its entirety. Couch testified that the three entities had the same, shared address.

**Management of the Enclave.** After a broker put Couch in touch with Morgan and Kirton, Brompton purchased six properties–the Enclave at Buckhorn Crossing, and five others not related to this appeal. Couch said that, in 2004, Greystar, which was the property manager, began reporting to him in his capacity as executive director of TIF Housing. In 2007, Couch, on behalf of Brompton, decided that TIF Management would take over as property manager.

**Debt service reduction.** Couch testified that the 75% of debt service reduction component of the final payment was a bonus for BIP for getting a reduction in the interest rate of the Prior Note through a modification. Couch said that more work was required to refinance as opposed to obtaining a modification. He described the amount of work for a refinancing as "horrendous" and "terrifically different." Couch testified that BIP was "to do the modification because they knew the lender . . . and [could] negotiate with these folks and possibly get us all in a better position for cash flow."

F.     **Brompton learns that BIP's expert revised his calculations many times before trial.**

At trial, BIP's expert, Scott Robin, testified about his calculations of the amount due at maturity. Brompton realized that Robin's testimony was not

consistent with the expert report that BIP produced in May 2019. After producing that report, BIP asked Robin to recalculate the amount due at maturity based on varying assumptions about how the parties' contracts may ultimately be construed. Although BIP argued that this did not require production of an updated report because it was no different from varying numbers in a calculator, the trial court recessed and continued the trial to permit Brompton to conduct additional discovery. The trial court later granted Brompton's motion for sanctions for discovery abuse. The trial court prohibited BIP from introducing evidence or testimony that: (1) CHDO fees, asset management fees, principal expenses, and/or reserve expenses are included in the meaning of "all expenses incurred" in the "operation" of the Enclave; and (2) mortgage payments, interest payments, mortgage insurance premiums, and/or reserves are not deducted when calculating Annual Expense Overruns after Brompton's first refinance.

### G. The trial court rules in favor of Brompton and awards attorney's fees.

After trial, the parties presented evidence of attorney's fees to the court in writing, in accordance with a Rule 11 Agreement. The trial court rendered judgment that appellants take nothing on their claims and that Brompton take nothing on its counterclaims. The court made the following declarations:

1. There was no modification of the Prior Note. Brompton does not owe BIP any sums under the Promissory Obligation resulting from any modification of the Prior Note.

26

2. The Promissory Obligation is a note in which recourse is limited to collateral covered by the Pledge and Security Agreement.

3. Brompton is liable for Annual Expense Overruns, as defined in the Pledge & Security Agreement, to the extent they were incurred while the Property was managed by Texas Inter-Faith Management between July 1, 2007 and Maturity Date. Texas Inter-Faith Management managed the property from July 1, 2007 [to] January 31, 2013.

4. The Promissory Obligation matured on December 31, 2017.

5. The Promissory Obligation superseded and replaced the Surplus Cash Note.

6. The $168,208.00 payment by Brompton to BIP in June of 2012 must be applied to the Promissory Obligation's principal.

7. The phrase Controllable Operating Expenses in the Pledge & Security Agreement does not include depreciation.

8. CHDO expenditures of $145,000.00 per year must be deducted from the calculation of Controllable Operating Expenses.

9. Asset management fees must be deducted from the calculation of Controllable Operating Expenses.

The trial court awarded Brompton trial attorney's fees of $843,669.00, plus conditional appellate attorney's fees. BIP appealed.

## Analysis

On appeal, the appellants raise ten issues. The first issue challenges the trial court's pretrial summary judgment, which held that appellants waived the right to receive surplus cash installments. The fifth issue challenges the trial court's failure to file findings of fact and conclusions of law. The second, fourth, sixth, seventh,

27

and eighth issues all, in some way, require us to interpret the contract. The third issue challenges the exclusion of expert testimony. The ninth and tenth issues challenge the award of attorney's fees.

## I. Findings of fact and conclusions of law

In their fifth issue, the appellants assert that the trial court reversibly erred by not making findings of fact or conclusions of law. Because BIP maintains that this alleged error prevented it from properly presenting its issues on appeal, we address this issue first.

When properly requested, the trial court has a mandatory duty to file findings of fact. TEX. R. CIV. P. 296, 297. If the court fails to file findings in response to a proper and timely request, the court of appeals must presume the trial court made all the findings necessary to support the judgment. *Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). "A party may rebut the presumption by demonstrating that the record evidence does not support a presumed finding." *Id.* at 135; *Marchand*, 83 S.W.3d at 795.

A trial court's failure to file findings of fact in response to a timely and proper request is presumed harmful unless the record affirmatively demonstrates the requesting party has suffered no harm. *Ad Villarai*, 519 S.W.3d at 135; *see* TEX. R. APP. P. 44.1 ("Reversible Error in Civil Cases"). This can occur when the

28

dispositive factual matters are undisputed or the issues on appeal are reviewed de novo. *See Ad Villarai*, 519 S.W.3d at 135; *Barker v. Eckman*, 213 S.W.3d 306, 310 (Tex. 2006); *Holmes v. Williams*, 355 S.W.3d 215, 223 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In this case, the issues on appeal center on construction of the parties' contracts, which we review de novo, or involve undisputed facts.

On appeal, Brompton argues that the appellants did not properly request findings of fact and conclusions of law. However, assuming that the request was proper and timely, the trial court's failure to file findings of fact and conclusions of law would, nevertheless, not be harmful. We overrule the fifth issue.

## II. Waiver of surplus cash payments and request for an accounting

In the first issue, the appellants argue that the trial court erred by granting summary, declaratory judgment that BIP waived the right to seek surplus cash installments and by denying their request for an accounting under the contract. We agree that the trial court erred by holding that BIP waived the right to seek surplus cash, but, in light of the availability of discovery, we find no error in the denial of BIP's request for an accounting.

### A. Standards of review

#### 1. Declaratory judgment

Declaratory judgments are reviewed under the same standards as other judgments and decrees. *Unocal Pipeline Co. v. BP Pipelines (Alaska) Inc.*, 512

29

S.W.3d 492, 499 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also* TEX. CIV. PRAC. & REM. CODE § 37.010 ("All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees."). We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Unocal Pipeline Co.*, 512 S.W.3d at 499–500.

## 2. Summary judgment

We review a traditional motion for summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). "[S]ummary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right to judgment." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511–12 (Tex. 2014). Under the traditional rule, courts "never shift the burden of proof to the non-movant unless and until the movant has establish[ed] his entitlement to a summary judgment . . . by conclusively proving all essential elements of his cause of action or defense as a matter of law." *Draughon v.*

*Johnson*, 631 S.W.3d 81, 87–88 (Tex. 2021) (quoting *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989) (internal quotation omitted)).

"Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern traditional summary judgments generally." *Sustainable Tex. Oyster Res. Mgmt., L.L.C. v. Hannah Reef, Inc.*, 623 S.W.3d 851, 862 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

## B.    Implied waiver

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). It is an affirmative defense. TEX. R. CIV. P. 94. The elements of waiver are (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Ulico Cas. Co.*, 262 S.W.3d at 778.

Waiver is largely a matter of intent. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n*, 1 S.W.3d 108, 111 (Tex. 1999) (per curiam); *Garcia v. First Colony Mall, LLC*, No. 01-17-00336-CV, 2018 WL 2638684, at *7 (Tex. App.—Houston [1st Dist.] June 5, 2018, no pet.) (mem. op.). "[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan v. Langley*,

111 S.W.3d 153, 156 (Tex. 2003). "Ordinarily, waiver is a fact question, but a party can establish waiver as a matter of law when the facts and circumstances are admitted or clearly established." *Garcia*, 2018 WL 2638684, at *7. "In determining whether waiver has occurred, courts examine the acts, words, or conduct of a party to determine if the party unequivocally manifested an intent to no longer assert the right in question." *Id.* (internal quotation omitted).

## C. Brompton failed to carry its summary-judgment burden.

Appellants argue that the trial court erred by granting summary judgment that BIP waived the surplus cash installments. In its summary-judgment motion, Brompton argued that the appellants knew that BC3 was using owner advances to pay CHDO fees and property taxes and that BC3 was repaying these advances before determining how much surplus cash was available for distribution to BIP.[3] Brompton's summary-judgment evidence included: (1) the Promissory Obligation; (2) the MIPA; (3) the PSA; (4) numerous financial statements and audits; (5) Couch's declaration; (6) deposition excerpts from Kirton, Morgan, and Robin; (7) correspondence among the parties regarding surplus cash calculations; and

---

[3] Brompton argued that it provided information, including notes in financial statements, indicating that BC3 had repaid owner advances as "other obligations," and that, by not timely pursuing a challenge to the payments, the appellants had impliedly waived their right to a computation of surplus cash as required by the contracts.

(8) cancelled checks showing payment of surplus cash to BIP and repayment of owner advances.

The appellants argue that there was a question of fact about their actual intent to waive surplus cash payments because they did not have sufficient information to allow them to intentionally waive the right. In addition, they argued that they contemporaneously objected to the calculation and underpayment of surplus cash.

### 1. The MIPA prohibited a finding of implied waiver.

Brompton's summary-judgment evidence included the MIPA, which defines surplus cash and includes a merger clause, which states that "[n]o . . . waiver . . . of this Agreement shall be binding unless executed in writing by the party against whom enforcement is sought." Brompton therefore could not prove that the appellants impliedly waived the right to receive installment payments of surplus cash calculated in accordance with the MIPA. And Brompton could not prove waiver at all in the absence of a writing signed by the appellants. Brompton's summary-judgment evidence did not include a writing signed by the appellants waiving or altering their right to receive installment payments of surplus cash calculated in accordance with the MIPA. Therefore, Brompton did not carry its burden to conclusively establish its affirmative defense of waiver. Because Brompton's summary-judgment evidence failed to establish its entitlement to

33

summary judgment, no burden ever shifted to the appellants. *See Draughon*, 631 S.W.3d 87–88 (stating that courts never shift burden of proof to nonmovant unless and until movant has shown entitlement to summary judgment).

## 2. HUD Requirements support this conclusion

Moreover, even if implied waiver were available in this case, we would not conclude that Brompton conclusively proved that the appellants intended to relinquish their right to semi-annual surplus cash installment payments calculated in accordance with the parties' contracts. The Promissory Obligation provides for its interpretation in consonance with HUD regulations, handbooks, administrative requirements, mortgagee notices, and documents. Under applicable HUD regulations and handbooks, owner advances can be repaid from surplus cash, but not as operating expenses that are paid prior to a determination of surplus cash. *See, e.g.*, *United States v. Coleman*, 200 F. Supp. 2d 561, 568 (E.D.N.C. 2002) (holding that owner advances could not be repaid as "operating expenses" when multifamily housing project, purchased with HUD-insured loan, was in non-surplus cash position); U.S. DEP'T OF HOUS. & URBAN DEV., FINANCIAL OPERATIONS AND ACCOUNTING PROCEDURES FOR INSURED HANDBOOK 4370.2 REV-1, § 2-11 (Repayment of Owner Advances) ("Advances made for reasonable and necessary operating expenses may be paid from surplus cash at the end of the annual or semi-annual period. . . . Repayment of owner advances when the project

is in a non-surplus cash position will subject the owner to criminal and civil monetary penalties.").

In this case, the Promissory Agreement limited Brompton's ability to use surplus cash to repay owner advances by obligating Brompton to use surplus cash to make semi-annual installment payments of the cash flow target (beginning at $11,087.50) plus 75% of all remaining surplus cash. Brompton argues that the appellants acquiesced in its decision to spend more than 25% of the remaining surplus cash (after the cash flow target) to repay owner advances instead of making semi-annual installment payments to BIP. But from 2011 on, the parties had ongoing disagreements about the calculation of surplus cash and the making of semi-annual installment payments. In May 2012, BIP asserted that Brompton was in default for failing to make semi-annual surplus cash installment payments beginning in February 2008. Because there is evidence that the appellants did not intentionally relinquish their right to payment in accordance with the contracts, Brompton could not conclusively prove implied waiver even in the absence of the anti-waiver provisions in the contracts.

Brompton failed to carry its summary-judgment burden, and the trial court erred by granting summary judgment.[4]

---

[4] While we conclude that the trial court erred by granting summary judgment because Brompton did not carry its burden, we also agree that the appellants'

We sustain this part of the appellants' first issue.

## D.    Accounting

On appeal, BIP states that the trial court erred by denying its request for an accounting. Appellant's Br. 17. BIP argues that the agreement was so complicated that it merits an accounting. We disagree.

We review a trial court's ruling denying a request for an accounting for an abuse of discretion. *See Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied) ("The granting of an accounting is within the discretion of the trial court."). "An 'accounting' is designed to require a person in possession of financial records to produce them, demonstrate how money was expended, and return pilfered funds in his or her possession." 1 TEX. JUR. 3d *Accounts and Accounting* § 166 (2024); *see Dipprey v. Double Diamond, Inc.*, 637 S.W.3d 784, 806 (Tex. App.—Eastland 2021, no pet.).

"[A] suit for an accounting may be either a separate suit in equity or a remedy sought in conjunction with another cause of action." *Constellation Brands, Inc. v. Roach*, No. 01-21-00155-CV, 2022 WL 17981666, at *5 n.4 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (citing *Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 674 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). "To be entitled to an accounting, a plaintiff usually must have a contractual

---

repeated questioning about the surplus cash calculations and payments at least raised a fact issue to preclude summary judgment.

or fiduciary relationship with the party from which the plaintiff seeks the accounting." *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Courts ordinarily will not imply a requirement for an accounting when the parties' contract is "silent on the matter." *T.F.W. Mgmt.*, 79 S.W.3d at 719. An accounting is proper "when the facts and accounts presented are so complex adequate relief may not be obtained at law." *Id.* However, "[w]hen a party can obtain adequate relief at law through the use of standard discovery procedures, such as requests for production and interrogatories, a trial court does not err in not ordering an accounting." *Id.* at 717–18.

In this case, the parties' contracts are silent on the matter of whether either party has a right to an accounting. The appellants have not demonstrated that they had a fiduciary relationship—as opposed to an arms-length contractual relationship—with the appellees. On appeal, the appellants did not demonstrate that standard discovery procedures were or would be inadequate. Accordingly, we conclude that the trial court did not abuse its discretion by denying the request for an accounting.

We overrule this part of the appellants' first issue.

## III. Exclusion of expert testimony

In the third issue, the appellants argue that the trial court abused its discretion by imposing a discovery sanction that prohibited their testifying expert witness, Scott Robin, from testifying about certain matters. Specifically, the trial court prohibited Robin from testifying that: (1) CHDO fees, asset management fees, principal expenses, and/or reserve expenses are included in the meaning of "all expenses incurred" in the "operation" of the Enclave and (2) mortgage payments, interest payments, mortgage insurance premiums, and/or reserves are not deducted when calculating Annual Expense Overruns after Brompton's first refinance. Brompton argues that the sanction was warranted due to BIP's violation of discovery rules.

### A. Discovery requirements for testifying experts

Rule of Civil Procedure 195 describes required and permissible discovery regarding a testifying expert witness in a suit not governed by the Texas Family Code. *See* Tex. R. Civ. P. 195.1–195.7.

> Without awaiting a discovery request, for any testifying expert, a party must provide a report that includes the following:
>
> . . . .
>
> > (3)    the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

38

(4)     if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

(A)     all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony;

. . . .

TEX. R. CIV. P. 195.5(a).

Communications between a party's attorney and a testifying expert are generally protected; however, communications that identify facts, data, or assumptions that the party's attorney provided, and the expert considered or relied on in forming opinions to be expressed are not protected and must be disclosed. TEX. R. CIV. P. 195.5(c). However, a "draft expert report . . . is protected from discovery, regardless of the form in which the draft is recorded." TEX. R. CIV. P. 195.5(d). If an expert report was "incomplete or incorrect when made, or, although complete and correct when made, is no longer complete or correct," TEX. R. CIV. P. 193.5(a), the party must amend or supplement its testifying expert report "but only with regard to the expert's mental impressions or opinions and the basis for them." TEX. R. CIV. P. 195.6.

Nevertheless, "[o]ur rules do not prevent experts from refining calculations and perfecting reports through the time of trial." *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993). "The testimony of an expert should not be

39

barred because a change in some minor detail of the person's work has not been disclosed a month before trial." *Id.* The requirement to supplement discovery exists to ensure "that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading." *Id.* Thus, an expert is required to supplement discovery when he changes his opinion about a material issue after deposition and production of a report. *See Kingsley Props., LP v. San Jacinto Title Servs. of Corpus Christi, LLC*, 501 S.W.3d 344, 353 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.).

## B. Sanctions for discovery abuse

Texas Rule of Civil Procedure 193.6 provides the general rule for sanctioning a party for failing to provide or supplement a discovery response:

> A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6.

The party who seeks to introduce the evidence has the burden to establish good cause or lack of unfair surprise or unfair prejudice. *Id.* The trial court may continue or temporarily postpone the trial to allow a party to make, amend, or supplement a discovery response and to allow the opposing party to conduct discovery about new information presented. *Id.*

Rule 195.6 of the Texas Rules of Civil Procedure provides the specific rule requiring that parties must amend or supplement the written reports of testifying expert witnesses with reasonable promptness. *See* TEX. R. CIV. P. 195.6. A supplemental response made less than 30 days before trial is presumed to be not reasonably prompt. *See* TEX. R. CIV. P. 193.5(b).

C.      **Standard of review**

We review the trial court's decision to admit or exclude evidence and its determination of good cause or lack of unfair surprise or prejudice under an abuse of discretion standard, considering whether the trial court's action was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–43 (Tex. 1985); *Leax v. Leax*, 305 S.W.3d 22, 32 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Erroneous admission or exclusion of evidence requires reversal if the error probably caused the rendition of an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Nissan Motor Co. v. Armstrong*,

41

145 S.W.3d 131, 144 (Tex. 2004). The Texas Supreme Court has recognized the impossibility of prescribing a specific test to determine whether a particular error is harmful and entrusts that determination to the sound discretion of the reviewing court. *Cent. Expressway*, 302 S.W.3d at 870. In conducting a harm analysis, we review the entire record. *Cent. Expressway*, 302 S.W.3d at 870; *Nissan*, 145 S.W.3d at 144; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). "[I]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992). The complaining party must only show "that the exclusion of evidence probably resulted in the rendition of an improper judgment." *Id.*

## D. The trial court improperly excluded evidence.

On appeal, appellants argue that the court erred by excluding evidence because no supplementation was required and there was no unfair surprise or prejudice to Brompton. We agree.

Our Rules of Civil Procedure sometimes require supplementation, but for a testifying expert report, supplementation applies "only with regard to the expert's mental impressions or opinions and the basis for them." TEX. R. CIV. P. 195.6. The revised reports and calculations created by Robin were done in regard to appellants' mental impressions and opinions about the meaning of the contracts.

During direct examination at trial, plaintiffs' counsel asked Robin about his calculations of debt service reduction, which was part of the formula for determining the amount of money owed on maturity. Robin testified that when he wrote the May 2019 report, he used August 1, 2018, as the date of maturity, saying: "[T]hat's what I was told the date was at the time I did this report." He described his method of calculating the debt service reduction as relying on arithmetic, and he explained how he would calculate the debt service reduction if the maturity date were one month earlier than the assumption used in his report. When asked what the total debt service reduction due at maturity would be based on a maturity date of June 30, 2018, Robin testified that it would be $3,112,940. After Brompton's attorney noticed that Robin was reading from a document, the court asked what the document was. Robin responded: "It's a printout of the revised changes I made to the report."

The trial court excluded evidence or testimony regarding (1) inclusion of CHDO fees, asset management fees, principal expenses, and/or reserve expenses in the meaning of "all expenses incurred" in the "operation" of the Enclave; and (2) not deducting mortgage payments, interest payments, mortgage insurance premiums, and/or reserves when calculating Annual Expense Overruns after Brompton's first refinance.

BIP and Robin had maintained throughout litigation that "all expenses incurred" included all expenses, including CHDO fees, asset management fees, and even depreciation. Kirton testified without objection that he believed "all expenses incurred by borrower" as used in the definition of controllable operating expenses necessarily included the six items to be deducted when calculating controllable operating expenses. He testified: "In order for those to be deducted, they have to be included, I believe, is the way that works." Morgan testified that he understood "all expenses" to include CHDO expenses and asset management fees, which are not included in "all expenses" for the purpose of a HUD audit. He said that "all expenses incurred by the borrower . . . . [was] not just some of the expenses incurred by the property." In its sanctions order, the trial court did not just exclude expert testimony, but it also struck "any testimony or evidence previously offered at trial relating to" the categories of evidence the trial court was excluding.

But Kirton's and Morgan's testimony on these matters came into evidence without objection. And their impressions and opinions are not the expert's mental impressions or opinions. Furthermore, Robin's recalculations made at BIP's request were simply a calculation based on hypotheticals considering how the court might construe the parties' contracts.[5] *See Exxon Corp.*, 868 S.W.2d at 304

---

[5] Robin made various calculations based on different assumptions about the eventual interpretation of the contracts, including: (1) varying the maturity date between June 30, 2018 and December 31, 2017; (2) varying the time

(holding that rules of procedure do not prevent experts from refining calculations through the time of trial). The hypothetical calculations that Robin made in the 14 months before trial were a refinement of calculations rather than a change in an expert's opinion that would surprise Brompton at trial. *See Exxon Corp.*, 868 S.W.2d at 304.

The trial court therefore erred by concluding that BIP had erroneously failed to supplement its expert report. Even if supplementation were required, however, exclusion is required only when the failure to supplement was without good cause or unfairly surprised or prejudiced the other parties. We have already explained that BIP's and Robin's position on what fees should be included in "all expenses incurred by borrower" was disclosed to Brompton before trial based on the calculations in the May 2019 report. The question about "amounts due lender" is present within the four corners of the PSA, which the trial court was asked to construe.

In the trial court, Brompton's attorney asserted that he would need additional time to take further depositions of Morgan and Kirton to discern their opinions

period for annual expense overruns based on assumptions about the relationship between Texas Inter-Faith Management and Texas Inter-Faith Housing Corporation; (3) varying the calculation of "all expenses incurred" from relying on the audited financial statements to include asset management fees and CHDO expenses in the tally of expenses; (4) and varying whether "sums due lender" would be included in the controllable operating expenses based on Brompton's contention that the Prior Note was paid in full when it was refinanced in May 2007.

about construction of the parties' contracts and time to again cross-examine them at trial. But at least some of their opinions about interpretation of the contracts was already part of their trial testimony. Brompton's attorney also testified that he would need additional time to ask his expert to perform additional calculations. While the trial court ultimately rejected this proposition, the changed assumptions were present on the revised calculations that BIP provided Brompton during trial in January. The trial court recessed trial for three months, which afforded Brompton time to take Robin's deposition a second time, and during which time Brompton could have asked his testifying expert to offer an opinion or additional calculations in response to the report Brompton received in January 2021.

Moreover, even if supplementation were required, Rule of Civil Procedure 193.6 provides the rule for exclusion of evidence:

> A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> (1)    there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2)    the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6.

In May 2019, Robin produced a supplemental expert report, which was the only report that contained his opinions about the amount of money Brompton owed at maturity. No further supplemental or amended reports were produced prior to the start of trial in January 2021. In November 2019, the trial court granted three partial motions for summary judgment, settling some of the parties' disputes about interpretation of the contracts. Three days later, Robin emailed BIP's counsel with new damage calculations revised to account for the trial court's summary judgments and to show what the numbers would look like under different assumptions regarding construction of the contracts. These assumptions included: (1) varying the maturity date between June 30, 2018 and December 31, 2017; (2) varying the time period for annual expense overruns based on assumptions about the relationship between TIF Management and TIF Housing; (3) varying the calculation of "all expenses incurred" from relying on the audited financial statements to include asset management fees and CHDO expenses in the tally of expenses; (4) and varying whether "sums due lender" would be included in the controllable operating expenses based on Brompton's contention that the Prior Note was paid in full by the refinancing in May 2007. Documents produced during trial showed that Robin initially made additional calculations in November 2019, and he continued to refine his calculations and share updates with appellants' counsel through the first day of trial.

Over a break in testimony, the appellants shared the document with the appellees, who later objected on the record, saying: "The number of calculations, I'm not exaggerating, will blow your mind. We have, I think, five or six different scenarios now, all with a bunch of new assumptions. None of this I've ever seen before." The appellants' attorney told the court that Robin never supplemented his report because the methodology did not change, and "it's basic arithmetic." The appellants maintained that supplementation was not required. They acknowledged that Brompton's attorney might be surprised but asserted that it was not unfair or prejudicial "because the data hasn't changed, nor has the formula or the basis for the calculation." Appellants' attorney asserted that Robin would be testifying about different hypothetical situations, calculated based on the same set of data that Brompton's expert relied on. Brompton maintained that the changes went beyond arithmetic because they represent different assumptions about interpretation of the contracts.

The court recessed the trial to give Brompton time to conduct further discovery including deposing Robin for a second time. After the deposition, Brompton filed a motion for sanctions asking the court to exclude evidence that was not disclosed. The appellants argued that exclusion of evidence was excessive and disproportional because they had already supplemented disclosures, Brompton

had the opportunity to take Robin's deposition a second time, and Brompton had ample time to review the information and prepare for cross-examination.

We conclude that the trial court abused its discretion by excluding testimony because the record does not support a finding of unfair surprise or unfair prejudice. *See* TEX. R. CIV. P. 193.6(b). We sustain this issue.

## IV. The combined error of finding waiver of surplus cash installment payments and exclusion of evidence at trial is harmful.

Trial court error in a civil case is reversible if we conclude that the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1.

As shown in the diagram below, the question of what specific values must be included in the quantity "all expenses incurred" in the operation of the Enclave is fundamental to a correct determination of the amount due at maturity. "All expenses incurred" is first used to determine the "controllable operating expenses," which is then used to determine "annual expense overruns," which is then used to determine the final payment due at maturity.

| Controllable Operating Expenses ("COE")<br>COE = all expenses incurred operating the<br>Enclave MINUS the total of:<br><br>1. Sums due on Prior Note<br>2. Insurance premiums/deductibles<br>3. Accounting expenses up to $5,000/y<br>4. CHDO expenditure $145,000/y<br>5. Asset Mgmt Fee; 1.5% gross rentals<br>6. Extraordinary costs | Annual Expense Overruns ("AEO")<br>(approx.)<br><br>(COE incurred while Property managed<br>by Texas Inter-Faith Management)<br>-   $531,360<br>―――――――――<br>AEO |
|---|---|

Payment Due at Maturity

$221,750
– (total principal paid before Maturity Date)
+ (75% of unpaid AEO)
+ (75% of debt service reduction
from modification of Prior Note)
―――――――――――――
Payment Due at Maturity

The parties do not dispute that there was some element of risk in their business arrangement. The inclusion of a final payment due at maturity in their contracts acknowledged that it might take time for the Enclave to generate enough surplus cash to enable Brompton to satisfy its contractual obligation to pay the appellants. The final payment due at maturity was a means to provide the appellants with some compensation should the semi-annual surplus cash installment payments fall short of satisfying Brompton's contractual obligation. The trial court erroneously granted summary judgment that the appellants waived their right to surplus cash payments, leaving the appellants without recourse to the

underpayments, except for the final payment on maturity. But the court then erroneously excluded evidence that was relevant to the determination of "all expenses incurred" in the operation of the Enclave and what amounts should be deducted in the calculation of controllable operating expenses once the Prior Note was extinguished by refinancing. This left the appellants without recourse to obtain compensation by way of a final payment. This combined error is harmful. Accordingly, we will reverse this case and remand to the trial court for a new trial and other proceedings in accordance with this opinion.

## V. Issues pertaining to interpretation of the parties' contracts

Because we will remand—and in the interest of judicial efficiency—we will address the several properly assigned issues of contract construction. Several disputes in this case center on the interpretation of the parties' contracts, whether Brompton was in default, and how much money, if any, is owed to the appellants under the terms of the contracts. Because of the lengthy litigation—including numerous pretrial motions—some of these issues were resolved by declaratory or partial summary judgment. On appeal, the appellants raise the following issues:

- Issue 2: Whether the trial court erred by granting Brompton's motion for summary, declaratory judgment that CHDO expenses and asset management fees must be deducted from the calculation of Controllable Operating Expenses;

- Issue 4: Whether the trial court erred by declaring that property taxes should be deducted as an extraordinary expense in the calculation of Annual Expense Overruns;

51

- Issue 6: Asserting that no evidence supports the trial court's "declarations (and any implied findings in support thereof) that: 'There was no modification of the Prior Note' and 'Brompton does not owe BIP any sums under the Promissory Obligation resulting from any modification of the Prior Note'";

- Issue 7: Asserting that no evidence supports the trial court's declaration that the Promissory Obligation matured on December 31, 2017.

## A.    Standards of review

### 1.    We construe appellants' issues reasonably, yet liberally.

BIP argues issues six and seven as sufficiency-of-the evidence issues. However, both issues, as well as issues two and four, require for their resolution construction of the parties' contracts. While construction of an ambiguous contract could implicate the sufficiency of parol evidence used to help discern the intent of the parties, whether a contract is ambiguous and that contract's interpretation are both questions of law that we review de novo. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

In this case, both the appellants and appellees have argued that their contracts are unambiguous, and we agree. Texas Rule of Appellate Procedure 38.1(f) provides that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included." TEX. R. APP. P. 38.1(f). "Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver." *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex.

2008). "[B]riefs do not have to perfectly articulate every point of law to preserve arguments that are fairly subsumed in the issue addressed." *Gill v. Hill*, 688 S.W.3d 863, 869 (Tex. 2024). Although appellants have briefed issues six and seven as sufficiency-of-the-evidence issues, we conclude that these issues fairly include a challenge to the trial court's construction of the contracts, and we will review them in that light. *See id.* (repeating oft-stated principle that appellate courts should reach merits of appeal whenever reasonably possible).

**2.    We construe the contracts to ascertain the parties' intent.**

In construing a contract, our goal is to ascertain the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). This an objective determination. *See URI, Inc.*, 543 S.W.3d at 764. "[I]n interpreting a contract, we "ascertain and give effect to the parties' intent expressed in the text, read without rendering any portion meaningless, and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address." *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 445 (Tex. 2024).

To make this determination, we begin with "the contract's express language," and we "consider the entire writing in an effort to harmonize and give

effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners*, 341 S.W.3d at 333 (internal quotations omitted). In interpreting a contract, we give undefined words their plain, ordinary, and generally accepted meanings absent some indication of a different intent. *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2016). We do not read any provision in isolation but consider each provision with reference to the whole. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

We may consider the context in which words are used in the contract itself when determining their meaning. *URI, Inc.*, 543 S.W.3d at 764; *see U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp*, 681 S.W.3d 383, 390 (Tex. 2023) ("Context is certainly a permissible indicator of meaning, . . . and courts must strive to 'harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.'") (quoting *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)). "Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass 'the circumstances present when the contract was entered.'" *URI, Inc.*, 543 S.W.3d at 764.

A court may consider the facts and circumstances surrounding the contract's formation as an aid in interpreting the contract's language, *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981), because the parol evidence rule does

54

not bar consideration of "surrounding circumstances that inform, rather than vary from or contradict, the contract text." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017). A court may not, however, consider "extrinsic evidence 'to create an ambiguity or to give the contract a meaning different from that which its language imports.'" *Id.* at 109–10 (quoting *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) (internal quotations omitted)). Evidence of the parties' conduct after contract formation is extrinsic evidence that may not be considered when interpreting an unambiguous contract. *See Sun Oil*, 626 S.W.2d at 732.

In addition, "Texas courts have long recognized that, under appropriate circumstances, 'instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other.'" *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (citations omitted)). A court may consider multiple separate contracts, documents, and agreements as part of a single, unified instrument when each written agreement and instrument was a necessary part of the same transaction. *Id.* at 94. This approach is, however, simply a method for ascertaining and giving effect to the parties' intent. *Id.* at 95–96.

If, after applying these rules and principles of contract construction, the contract is subject to more than one reasonable interpretation, then we will conclude that it is ambiguous. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). We may conclude that a contract is ambiguous even if no party pleads ambiguity. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993). If the contract is ambiguous, the parties' intent is a question of fact for the factfinder. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam). If the contract's language can be given only one definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *See Plains Expl.*, 473 S.W.3d at 305.

## B.  CHDO Expenses and Asset Management fees must be deducted in accordance with the contract.

In the trial court, Brompton sought a summary, declaratory judgment about the calculation of the final payment due at maturity. Brompton argued that the appellants were refusing to follow the plain language of the PSA by not subtracting CHDO expenses and asset management fees from "all expenses incurred" when calculating Controllable Operating Expenses. The trial court declared that CHDO expenses and asset management fees must be deducted in that calculation.

In the second issue, the appellants argue that the trial court erred by granting Brompton's partial motion for summary judgment regarding CHDO and asset management fees because it was contrary to the parties' intent. The appellants

maintain that the parties intended to provide a calculation that would allow them to compare expenses to an index and compensate them upon maturity if annual expense overruns had reduced the semi-annual installment payments they received during the life of the Promissory Obligation. They maintain that the Controllable Operating Expenses calculation was intended to subtract some expenses from all expenses, and that subtracting CHDO expenditures and asset management fees from "all expenses" only made sense if CHDO expenditures and asset management fees were first included in "all expenses." The appellants argued that because CHDO expenditures and asset management fees were not included in accounting statements as expenses, the court's declaration that required the parties to subtract those items from "all expenses incurred" made the term "all expenses incurred" meaningless.

Section 7.10 of the PSA provides that if the Enclave had an Annual Expense Overrun, as defined by the formulas in the PSA, then BIP could terminate the existing property manager and replace it with one of several approved property managers. This paragraph ends with the definition of Controllable Operating Expenses:

> The term Controllable Operating Expenses shall mean all expenses incurred by Borrower in the operation of the Subject Property owned by the Company (as defined below) less:
>
> . . . .

57

(4)  CHDO expenditures of $145,000.00 per year;

(5)  An Asset Management fee of not more than 1.5% of the gross rentals received from the Property; and

. . . .

The plain language of the PSA requires that CHDO expenditures and an asset management fee be deducted from "all expenses incurred" to calculate the Controllable Operating Expenses. We do not find this straightforward requirement to be susceptible of more than one reasonable interpretation and therefore ambiguous. *See Plains Expl.*, 473 S.W.3d at 305. "[W]e presume the parties intend what the words of their contract say." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). We hold that the trial court did not err by declaring that CHDO expenditures of $145,000.00 per year and asset management fees must be deducted from the calculation of Controllable Operating Expenses.

We overrule the second issue.

**C.  Brompton's payment of property taxes for 2011 and 2012 in conjunction with its refinance is an extraordinary expense.**

In connection with a refinancing in 2013, Brompton was required to pay property taxes for 2011 and 2012 that were then under protest. At trial, the parties argued about whether the $1,185,654 expense should be deducted as an "extraordinary expense" when calculating controllable operating expenses as a preliminary calculation to be used in computing annual expense overruns and the

58

final payment due at maturity. At trial, Brompton's expert deducted the property taxes as an extraordinary expense. The appellants' expert did not. Unlike the prior issue, the trial court did not expressly interpret the contract through a declaration.[6]

The appellants argue that the trial court implicitly held that Brompton's payment of 2011 and 2012 property taxes in 2013 should be deducted in the calculation of controllable operating expenses as an extraordinary expense. They maintain that this is an erroneous interpretation of the contract. Brompton asserts that the payment of property taxes was never expected because the parties' transaction was based on its ability to obtain a tax exemption for the Enclave.

When construing a contract, our goal is to ascertain the true intent of the parties when the contract was formed. *See Anglo–Dutch Petroleum Int'l*, 352 S.W.3d at 449–50. The PSA defined controllable operating expenses as "all expenses incurred by Borrower [Brompton] in the operation of the Subject Property owned by the Company [BC3] (as defined below) less" six items to be deducted, the last of which was

> Extraordinary costs and expenses incurred in connection associated [sic] with the management and operation of the Property including litigation expenses, expenses incurred in defense of title to any part of the Subject Property governmentally mandated charges (such additional regulatory requirements, etc.), condemnation or casualty of all or any part of the Property, or any other extraordinary expense which was not reasonably foreseeable by Borrower or not covered by

---

[6] The trial court granted a judgment that the appellants take nothing on their claims against Brompton.

insurance and which, if in excess of $25,000 in any calendar year, was not reasonably approved by Lender.

"Extraordinary costs and expenses" were not further defined in any of the contracts. Merriam-Webster's Dictionary defines "extraordinary" as "going beyond what is usual, regular, or customary." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/extraordinary (last visited December 27, 2024). Similarly, Black's Law Dictionary defines "extraordinary" as "beyond what is usual, customary, regular, or common." EXTRAORDINARY, Black's Law Dictionary (12th ed. 2024). Merriam-Webster's Dictionary defines "foreseeable" as "being such as may be reasonably anticipated." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/foreseeable (last visited December 27, 2024). Black's Law Dictionary defines "foreseeability" as "the quality of being reasonably anticipatable." FORESEEABILITY, Black's Law Dictionary (12th ed. 2024).

Considering the plain language of the contract in light of these definitions, we conclude that an extraordinary expense is one that was unusual and could not be reasonably anticipated by the parties at the time that they entered into the contracts. The interpretive question then becomes whether the parties could have reasonably anticipated that BC3 would need to pay property taxes at all or as part of a refinance when they signed their contracts on December 31, 2003.

We conclude that the answer is no. When the parties entered into their contracts, it was after BIP had failed to make a profit operating the Enclave, due primarily to the high cost of debt service and property taxes. Brompton was selected as a buyer—and agreed to buy the Enclave despite the property's distressed financial position—because it had the ability to obtain a tax exemption. Brompton's payment of property taxes for the Enclave was therefore unusual, not customary, and not anticipated when the parties entered into the contract. We conclude that the payment of 2011 and 2012 taxes was extraordinary because the parties could not have reasonably foreseen the need for Brompton to pay property taxes. To the extent that the trial court inherently construed the PSA in this way, we overrule this issue.

### D. The Prior Note was not modified.

In its amended final judgment, the trial court declared: "There was no modification of the Prior Note. Brompton does not owe [BIP] any sums under the Promissory Obligation resulting from any modification of the Prior Note." In the sixth issue, the appellants challenge this declaration.

The Promissory Obligation included a paragraph called "Terms of Payment." In addition to setting out the basic terms for semi-annual installment payments, and a single lump-sum payment, and a final payment due at maturity,

61

this paragraph also includes the following language relating to decreases in debt service.

> Notwithstanding any other provision contained herein, but subject to the provisions of the Regulatory Agreement and HUD requirements, if Maker modifies or refinances the mortgage indebtedness associated with the Prior Note at any time prior to the Maturity Date, then, (i) any net proceeds resulting from any such modification or refinance transaction shall be paid to Seller and credited as a principal reduction of this Note to the extent that any principal balance hereof remains outstanding on the closing and funding date of any such modification or refinance transaction; (ii) beginning on the date that the next Installment is due, the Cash Flow Target will be increased by an amount equal to fifty percent (50%) of any resulting reduction in the Property's annual debt service, including any reductions in interest, mortgage insurance premiums, and replacement reserve deposits. In addition, **the amount due on the Maturity Date defined below shall be increased by an amount equal to seventy-five percent (75%) of any reduction in the Property's debt service** (including any reductions in interest, mortgage insurance premiums, and replacement reserve deposits) that accrues from the effective date through the Maturity Date **resulting from any modification of the Prior Note**, the terms of which shall be consistent with prevailing market conditions.

(Emphasis added.)

The appellants argue that the word "modification" as used in the phrase "resulting from any modification of the Prior Note" at the end of this paragraph is used in an ordinary way to refer to any change in the interest rate. Brompton asserts that the term "modification" in that phrase refers to a modification of the Prior Note itself, as contrasted with a refinance. We agree with Brompton.

First, a plain reading of the relevant provision reveals that the increase in the payment due at maturity is contingent on a "modification of the Prior Note," not a a reduction in interest rate. The words "interest rate" do not appear in this provision, where the parties refer to the debt service. Earlier in the paragraph, the words "modification or refinance" are used, whereas at the end of the paragraph, only the word "modification" is used. This points toward a conclusion that the parties intended the provision at the end of the paragraph to apply only if the Prior Note itself was modified but not if it was refinanced.

Second, we must also consider the context of this provision in light of the realities this provision was meant to address. *See IDEXX Labs.*, 691 S.W.3d at 445. When the parties entered into this transaction, recognizing that a reduction in debt service was critical to the success of the business venture and that the legal responsibility for the Prior Note was being transferred to Brompton, all the parties promised to use their best efforts to reduce the debt service. Morgan and Kirton agreed to use their relationship with the mortgage lender to try to persuade the mortgage lender to reduce the interest rate on the Prior Note. Brompton agreed to consider refinancing to reduce the debt service on the mortgage indebtedness associated with the Prior Note. The parties envisioned that it would most likely be Morgan and Kirton's efforts that would bring about a modification of the Prior Note to reduce the debt service, but it would necessarily be Brompton's efforts that

63

would bring about a refinancing of the Prior Note to reduce the debt service. And Couch testified that the effort needed to refinance the mortgage indebtedness far surpassed the effort that would have been required to obtain a modification of the Prior Note.

The final payment due at maturity was intended to provide additional compensation to the appellants in the event that circumstances prevented Brompton from fully paying the purchase price through semi-annual surplus cash installments during the term of the parties' contract. Any reduction in debt service would, in theory, help increase the surplus cash available for making semi-annual installment payments on Brompton's debt to BIP. But it would also increase the amount of surplus cash that Brompton would retain and be able to use for its own purposes because BIP was entitled to only 75% of the surplus cash remaining after Brompton paid the cash flow target installment payment.

Our conclusion that this provision applied only to a modification and not refinancing is bolstered by consideration of the context and realities of the business transaction. By increasing the final payment due at maturity if the debt service was reduced through a modification, the contract incentivized Morgan and Kirton to work to obtain the modification after the sale. It reallocates the potential windfall that Brompton would have received from that debt service reduction without having to expend much effort. But by limiting the additional amount of the final

payment due at maturity to only a modification and not a refinance, it compensates Brompton for the work and effort needed to obtain a refinance—which it did, not once but twice in this case.

We conclude that the contractual provision in question applies only to a modification of the Prior Note. It is undisputed that there was never a modification of the Prior Note, though the mortgage indebtedness was refinanced twice. We hold that there was no error in the trial court's declaration that there was no modification of the Prior Note and that Brompton does not owe any sums under the Promissory Obligation resulting from any modification of the Prior Note. We overrule this issue.

### E.    The Promissory Obligation matured on June 30, 2018.

In the seventh issue, the appellants argue that the trial court erred by declaring that the Promissory Obligation matured on December 31, 2017. The appellants argue that this was an erroneous construction of the parties' amendment.

The Amendment to the Promissory Obligation that changed the maturity date stated:

> The Maturity Date (as defined in the Note) is hereby extended to the last day of the twenty-second (22nd) semi-annual fiscal period following the closing of the refinance of the Prior Note.

It is undisputed that the refinance of the Prior Note closed on May 30, 2007. The appellants assert that, under the amendment, the first semi-annual fiscal period

following the closing of the refinance of the Prior Note began on July 1, 2007, and the last day of the first semi-annual fiscal period following the refinance was December 31, 2007. This would result in a maturity date of June 30, 2018, the last day of the 22nd semi-annual period following the refinance. Brompton argues that the last day of the first semi-annual period following the refinance was June 30, 2007, which would make the maturity date December 31, 2017.

The plain language of the amendment is susceptible of two contrary readings. It could require that the parties count 22 last days of the semi-annual fiscal periods after the closing of the refinance to arrive at a maturity date. Or it could require that the parties count 22 full semi-annual fiscal periods after the refinance, with the maturity date occurring on the last day. But this does not render the amendment ambiguous; it simply means that a plain reading of the text alone is inconclusive. *See Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 152 (Tex. 2020) ("Although the sentence might therefore be characterized as 'ambiguous' in the colloquial sense of the word, the term 'ambiguity' in Texas contract law connotes a greater degree of linguistic indeterminacy than it does in common parlance.").

Instead, we must consider the context in which the parties entered into the amendment to the Promissory Note. The amendment was signed in anticipation of the 2007 refinance of the Prior Note. As we have explained, reduction of the debt

service on the mortgage indebtedness was critical to the success of this business deal because the high cost of debt service impacted the amount of surplus cash available for Brompton to pay its debt to BIP. Indeed, from 2004 through 2006, Brompton had not made any installment payments to BIP. At trial, Couch testified that extension of the maturity date was included in the amendment to the Promissory Obligation "to allow more time for cash flow to pay on the note." Allowing more time for "cash flow to pay on the note" would have advantages for BIP, because it would allow more time for the Enclave to become profitable and allow Brompton to pay its debt from surplus cash. Allowing more time for "cash flow to pay on the note" would also have advantages for Brompton by reducing the final payment due at maturity. The Promissory Obligation's formula for calculating the final payment due at maturity requires the subtraction of "the sum of the principal portion of all Installments paid by Maker, prior to the Maturity Date." More installment payments would mean a larger principal portion of installment payments made before the maturity date, and a lower final payment due at maturity.

Construing the text and context of this provision together yields a conclusion that there is only one reasonable construction: that the parties intended the Maturity Date to be extended to June 2018. Because the trial court erred by

declaring that the Promissory Obligation matured on December 31, 2017, we sustain this issue.

* * *

Because we are remanding to the trial court, we do not need to address appellants' issues 8, 9, and 10. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the judgment of the trial court and remand to the trial court for further proceedings in accordance with this Court's opinion.


Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.